May it please the Court, David Weinzweig for Petitioner. I'll try to save two minutes for rebuttal. Your Honors, on this record, under the law as articulated by this Court, there is but one conclusion. And that is that Mr. Pardae has substantial grounds to believe that he will be tortured if removed to Liberia. When last in Liberia, Mr. Pardae bore painful witness to the longstanding hatred that divides and consumes that nation's tribal factions. And in particular, the deep chasm between his people, the Kron, and the Gio and Mano tribesmen who decapitated his father on the road to Sierra Leone and tortured his family. The record here included no reasonable basis for the immigration judge to speculate how tribal murderers will treat the returning victims of their violence. No substantial basis to conclude that sworn tribal enemies will be willing to let bygones be bygones. And no reason for optimism that although Mr. Pardae will likely be recognized as a Kron tribesman, he need not worry about a return to Liberia. And the law on the Convention ‑‑ So you don't ‑‑ you don't believe the country reports are accurate? Your Honor, I'm not challenging the contents of the country reports. In fact, what I'm saying is the country reports, if anything, support the ‑‑ the application of Mr. Pardae for a deferral of removal. The individual specific information that goes directly to Mr. Pardae's past torture and fear of future torture support the notion that the Gio and Mano are still there. They still hate the Kron. Tensions persist. And that is in the country report year after year, although the immigration judge neglected to include that information in his decision. But the law on the Convention is well established by this circuit, and that is a person cannot be removed to another nation under the Convention if there are substantial grounds for believing that the person would be in danger of being subjected to torture in that nation. Now, under ‑‑ It's either by the government or by a group that the government is unable or unwilling to control. Correct. Now, past torture is the first and principal factor, as this Court states. But you're not saying that he would be subject to torture by the government, are you? I am not saying he would be subject to torture by the government. I am saying that he would be subject to torture by the same elements that decapitated his father and tortured his family the last time he was there, and that is the Gio and Mano tribesmen in a rural section of Liberia, on the other end of Liberia, in fact, from Monrovia, which is the capital. Now, there is a provision that on humanitarian grounds, if the individual has been tortured or to observe terrible things happening to his family, has that been presented to the board or to the immigration judge? I am not aware of that being presented. At least I didn't see that provision in the briefing before ‑‑ well, in the record, in the briefing before the BIA. He was prepared before the IJ and the board. Correct. And was he advised by the IJ of the availability of that provision? I can tell you specifically what he was advised of. He was advised that there were three things available, asylum, withholding of removal under both the federal law and the convention, and number three, deferral of removal. I didn't see any of that. Well, I can tell you more. He was advised that in order to find torture, he would have to show that the government would torture him. Correct. Okay. And he wasn't advised of anything else as to how he could establish torture. That is correct, Your Honor, repeatedly. Now, who gave him this advice? Was it the immigration judge? The immigration judge provided that direction throughout the course of a few hearings. He tempered the presentation that Mr. Partey might have given by saying, I want something to be crystal clear, and that is, here's what you need to show. You need to show the present government of Liberia would torture you if you return. And that appears, if you look in the briefing, there's a chart that sets forth each of, I think, maybe five or six offhand separate instructions as to what the hurdle, what hurdle Mr. Partey needs to pass. I assume you were appointed by this Court to handle this case? Correct, Your Honor. Now, going back to the factors under Catt, the first and principal factor under Neuru is past torture, and that is, quite simply, because past is prologue. Past torture tells us much about how an individual or government will behave in the future. And for that reason, this Court has explained that in cases where you have past torture, unless circumstances or conditions have changed significantly, not just in general, but with respect to a particular individual, then it is likely that individual will be subject to more torture if returned to the site of the initial torture. Now, in this case, it is undisputed. In fact, the government conceded and the immigration judge held that torture had been established. What this meant is that Mr. Partey could not be removed to Liberia unless circumstances or conditions had or have changed significantly with respect to Mr. Partey in particular. Evidence of general change, as this Court has stated again and again, would not be sufficient. But on this record and with these country reports and with an article from the African News, the immigration judge couldn't get there because, in fact, there was no evidence of significant change when the record was considered in its entirety, just the opposite. Do you want to save time for rebuttal? Yes, Your Honor. You have about a minute and a half. I will. Thank you. Good morning, and may it please the Court. My name is Greg Mack, counsel for the Respondent, the Attorney General of the United States. The immigration judge acknowledged that it was regrettable that relief could not be granted in this case. But the immigration judge had a responsibility not to only focus on what had happened to a petition in the past, but to apply the law with respect to him. Well, did he correctly inform the petitioner about the law regarding torture? I think he did, Your Honor, ultimately in his immigration judge decision and overall. No, no, that didn't inform the petitioner at his hearing about what the law was. It was his responsibility to advise the petitioner of what the law was and what he had to establish, wasn't it? It was indeed, Your Honor. And did he properly inform him about what he had to establish for torture? I think the immigration judge endeavored to inform him what he had to prove. He endeavored to. It doesn't matter. The question is, did he properly inform him of the elements that were required to establish torture? I think overall he tried to advise him that you had to prove. But that tried to advise him. You know, did he or didn't he properly advise him of what he had to prove to establish torture? The immigration judge pointed to torture by the government. Yes. And ultimately in his decision – Now, ultimately his decision doesn't help to answer the question of what the petitioner was advised of he had to prove at the hearing. And I think the immigration judge struggled along with the petitioner here to – Well, he didn't have to struggle because the law was clear that it was not only torture by the government, but torture by other elements that the government either was unwilling or unable to control. Did he advise him of that? I don't believe that the immigration judge did advise him of that in totality. The immigration judge said – Totality? He didn't advise him at all beyond the government. That's correct. Immigration said torture by the government. Then why should we not reverse because the petitioner who was pro per was not told that he could establish torture by showing that it was – that he feared not just the government, but the other elements that the government was unable or unwilling to control? Because, Your Honor, in those sorts of due process claims, you not only have to prove cause that a violation occurred, you have to prove that the individual was prejudiced by that determination as well. In this case, he – Mr. Mack, let me ask you also – first of all, before you get to your cause and prejudice argument, do you agree that that due process claim was administratively exhausted before the BIA? I don't believe it was, Your Honor. What I believe was exhausted before the BIA was a concern about not being allowed to testify about his scars, not about this larger question with respect to the suppression. So is it your position that we can or cannot reach the merits of that due process argument? It would be my position that the Court cannot review that question because it could have been resolved by the Board and those sorts of claims have to be exhausted to the Board. But I think from a larger perspective, what I was going to get out in my answer, Your Honor, was the cause and prejudice prong. And – Now, before you get to cause and prejudice, are you familiar with Park Guyon v. Holder? No, I'm not, Your Honor. Okay. That's a 2011 case in which we talked about the forgiving standards. Do we have to apply whether it's a pro per and who just alleges due process without the specifics? I'm not aware of that case, Your Honor. Okay. But as I was going to say with respect to the cause and prejudice prongs of the due process claim, you not only have to prove cause, you have to show that you were prejudiced by the alleged violation. And here, there was no prejudice here. The Petitioner testified with respect to what had happened to him in the past and his mother testified, but there was no testimony with respect to what would happen to him or, excuse me, what were the conditions on the ground in Liberia. His testimony was largely about what had happened about to him and his family in the past, as well as his mother's testimony, but – Well, why would he try to testify to establish something that the judge told him would not do him any good? All he had – all he could talk about was what the government did to him. Well, Your Honor, with respect, the judge didn't just say you can only talk about past persecution – excuse me, past – No, no, no. Only the government's persecution that counts for fear of future persecution. But, excuse me, but, Your Honor, with respect, the immigration judge didn't confine him to saying past persecution by the government. The immigration judge, towards the end of the hearing, asked, do you have anything else to offer to the Petitioner? And the Petitioner, I think, said no. So that – he wasn't precluded from talking about what would happen with respect to other ethnic groups on the ground. And in addition, the Petitioner didn't present any testimony with respect to what were the conditions on the ground, because after all – Well, why would he, when the only thing that mattered was what the government would do to him? Well, he could have answered the question, yes, I have additional information, when he was asked by the immigration judge. Do you have anything else to add? Well, he could have said, I'm a better lawyer than you are, even though I'm pro pur, and I know nothing about this. So I'll tell you things that you have told me don't really matter. I'll tell you things that it's not just the government, or not the government that I fear. I could tell you that if you understood the law, but that's not the way the law works. The law is that the immigration judge is supposed to explain to pro pur people who don't know about the law what you're supposed to introduce. And that's why I say, Your Honor, the immigration judge asked the Petitioner here, is there anything else you wish to add? And after all, there's a claim in the briefing here. He could have said, well, he could have added, for instance, I don't think this is a fair country if we conduct proceedings like this, but it wouldn't have helped him. He could have answered the question with respect to what do you know about the other ethnic groups on the ground, what are your concerns going forward in Liberia, and he said, I have no information with respect to what's going on on the ground in Liberia. And the immigration judge again asked, do you have any other information  And in this case, I believe it was suggested by the Petitioner. So, Mr. Mack, you're saying that any prejudice argument that the Petitioner may have is completely undercut by that catch-all question. Do you have anything else to add? Well, not completely, Your Honor. I think the immigration judge was endeavoring to find out what information this Petitioner had. And if I could continue, I believe there's a suggestion in the record here that the Petitioner was illiterate. And I think, as I said before, the immigration judge was endeavoring to move this case along to get and extract the information from this particular individual. And the immigration judge asked, is there anything else you have to add here? And there was a long attempt by the immigration judge to obtain interpreters and aid this individual and bring the evidence forward. But in the end, the prejudice question comes down to, you know, did this affect the outcome of the proceedings? And the Petitioner had no information with respect to what was going on on the ground in Liberia today. And the immigration judge looked at the country reports and said, look, there's been a radical change in Liberia. It is not more likely than not that you will be tortured in Liberia because of the changes on the ground in Liberia. Because of this substantial change in the conditions in Liberia, the immigration judge rightfully concluded that it would not be more likely than not that he would be tortured. Now, there's a claim that he's illiterate in this record. So, I mean, the immigration judge has an obligation to explain what standard and what tests you have to provide. But to an illiterate person, I think an immigration judge answering the question, do you have any more information to provide, is key and important here. What more can the immigration judge do? If the immigration judge explains to him. Kennedy, what more he can do is advise him properly as to the law, which is his duty. That is correct, Your Honor. But, again, there's a claim of illiteracy. If you ask the question, what more could he do? Well, he could have done that, but he didn't do that. But he asked, is there additional information that you have to provide. Explaining the niceties of the regulation to the individual might not have necessarily aided the individual. But the immigration asking the individual, do you have any more information to provide, was and should have been sufficient to extract the information that the immigration judge needed to resolve this case. And the immigration judge resolved this case on what had happened on the ground in Liberia, information to which the Petitioner did not have any information at all anyway. Are you familiar with Pagayan? No, that's the one you said you weren't. Are you familiar with Ag Yemen v. INS from 2002, which said that you don't have to show the prejudice in this type of case, that you don't have to explain what evidence you would have presented, and that you infer prejudice in these circumstances? I'm not specifically familiar with that one. What I'm familiar with is procedural due process claims have to be exhausted, Your Honor. I don't know why you come here to argue these cases if you aren't familiar with the two controlling cases. Well, I am familiar with the principle that for procedural due process claims, you do have to exhaust those claims. Yes, but you aren't familiar with our case, which explains that all you have to do is say due process, and that any issue covered by that. And what I want to do, well, with respect, Your Honor, what I want to say is I don't want to say that I am familiar with a case that I'm not, and I don't know whether Ag Yemen deals with a substantive due process claim or a procedural due process claim. If it's procedural due process, that has to be exhausted, Your Honor. And I don't want to say that I am familiar with a case that I'm not, and I don't  due process claim. I just want to say that this is a case where I have to give the board an opportunity to correct the procedural error below. All right. It's rather disappointing that the government takes some of these positions in light of our decisions or even not in light of our decisions. Thank you, counsel. Thank you, Your Honor. The Court spent some time noting that the IJ gave the wrong advice. We agree and also agree that a generous exhaustion standard is recognized in this circuit because Mr. Pardee was pro se. But to be clear, we are asking today for more than just a remand. The evidence established that Pardee, even with the bad advice from the immigration judge, did meet the standard. So this Court should reverse outright. Pardee did establish a fear of torture, and that's set forth in the brief. There are many pages dedicated to it, to evidence that the immigration judge did not Why does that establish that the tribes would not be controlled by the government in the future? It was not presently being controlled and that they were conducting torture in the country. Well, as Your Honor noted, the torture does not have to be conducted by the government. It could be conducted by private parties with willful blindness. And how is that established, that there was a tribe in the country that the government was either willfully blind to or was unwilling or unable to control? Well, both the article and the country conditions state again and again that there are still significant tensions between the Cron and the Geo and Mono. And what that article establishes is that based upon mere rumor that victims of the Geo and Mono are returning from exile, that alone led the Geo and Mono to all get together, hundreds of them with machetes, and go down the street chanting. So what I think the larger point is, is that the Geo and the Mono are leaving nothing to the imagination here. That if victims, whether it's Mandangos or Crons, and they're aligned, they fought together and they fled together, when they come back, or if they try to come back, the Geo and the Mono, as that article shows, will meet that with violence. And the country condition reports, Your Honor, also reflect that tension continues between the Cron and the Geo and the Mono. And very importantly, the immigration judge did not include any of that in his opinion. His opinion instead relies upon general conditions while ignoring specific conditions. And even as to the general conditions, the immigration judge slices sentences in half, literally, and only uses the good, well, not the good, the helpful language that supports his conclusion while tossing the remainder to the side. All right. Thank you. You're way over time. Thank you. Thank you, Your Honor. The case disargued will be submitted.
judges: Fletcher, Reinhardt, Tashima